IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN THE MATTER OF THE SEARCH OF:

IPHONE 13 PRO MAX DESCRIBED IN
ATTACHMENT A, SEIZED FROM SHAKEYA
HUGHEY AND IN FBI CUSTODY

**Filed Under Seal**

Case No. 3:23-sw-124

**AFFIDAVIT IN SUPPORT OF
APPLICATION FOR A SEARCH WARRANT**

I, **Stephen C. Lamar**, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Task Force Officer with the Federal Bureau of Investigation and have been

so assigned since April 7, 2021.  I am employed by the Fredericksburg Police Department, where

I serve as a Narcotics Investigator.  Prior to that assignment, I was assigned to the Patrol

Division.  I have received basic training in drug investigation techniques such as drug

identification, constitutional law, Virginia law and criminal behavior at the Rappahannock

Regional Criminal Justice Academy located in Fredericksburg, Virginia. I have received

extensive training in criminal interdiction, hotel interdiction, drug identification, social media

and open-source investigation through Street Cop Training. I have received training from the

National Association of Drug Diversion Investigators (NADDI), and I am a certified drug

diversion investigator. I am a graduate of Top Gun XXVIII where I received training in the

investigation and prosecution of drug cases in the Commonwealth of Virginia. I am a recognized

drug expert in both the General District and Circuit Courts of the City of Fredericksburg.



2.      I have participated in the preparation and execution of numerous arrests and search warrants for criminal offenses involving the possession and trafficking of illegal narcotics. I am familiar with the methods narcotics traffickers commonly use to conduct their illegal activities, including communication methods, the use of cellular communication devices and applications, the use of vehicles equipped with secret compartments, and the way narcotics transactions are typically accomplished. I am familiar with counter-surveillance methods narcotics traffickers use while engaged in illegal activities. I have participated in numerous investigations that require surveillance, to include investigations in conjunction with the interception of electronic communications. Through my employment as a law enforcement officer, I have gained knowledge in the use of various investigative techniques, including oral, and electronic interceptions and other types of electronic surveillance, physical surveillance, undercover operations, confidential informants, cooperating witnesses, controlled purchases of illegal drugs, consensually-monitored recordings, investigative interviews, trash searches, mail covers, financial investigations, administrative and grand jury subpoenas, and search and arrest warrants.

3.      Through instruction, training, and participation in investigations, as well as through consultation with other agents and law enforcement personnel, I have become familiar with the manner and methods by which narcotics traffickers conduct their illegal business and use coded words to disguise conversations about their narcotics activities, especially when they are communicating by telephone.  I have had the opportunity to interview individuals involved in narcotics trafficking concerning the various methods by which they operate, to include their use of coded language and the avoidance of specific references to narcotics, and their practice of conducting most or all their transactions in cash to avoid leaving a paper trail of their narcotics

purchases, sales, and proceeds. I have also learned that narcotics traffickers at the higher levels

of the trafficking hierarchy tend to avoid or minimize their possession of narcotics to avoid

apprehension by law enforcement and that these higher-level narcotics traffickers tend to operate

through intermediaries or "runners" to further minimize their own exposure. In addition, I have

learned the measures that narcotics traffickers use to avoid law enforcement surveillance and

investigations, such as the development and use of aliases; the use of cellular telephones and

other communication devices; the use of other individuals' names for telephones, assets,

vehicles, houses, bank accounts, utilities, etc., in order to avoid the use of their own names being

associated with these items and assets; and the use of counter-surveillance driving techniques to

detect law enforcement surveillance and avoid being followed by law enforcement.

4.      The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set

forth all of my knowledge about this matter.

## ITEM TO BE SEARCHED

5.      The item to be searched is an Apple iPhone 13 Pro Max utilized by Shakeya

HUGHEY ("HUGHEY") and seized from the home of HUGHEY pursuant to a search warrant

(hereinafter "TARGET CELLULAR DEVICE"), which is more fully described in Attachment

A, incorporated by reference herein. The TARGET CELLULAR DEVICE is currently located in

the Evidence Control Room of the FBI's Richmond Division located at 1970 East Parham Road,

Richmond, Virginia, which is located in the Eastern District of Virginia. Through my training

and experience, I know that the TARGET CELLULAR DEVICE has been stored in a manner to

preserve the information contained on the TARGET CELLULAR DEVICE. This application

seeks a search warrant authorizing a forensic examination of the TARGET CELLULAR

DEVICE for the purpose of identifying the electronically stored information described in

Attachment B, incorporated by reference herein, which constitutes evidence of illegal

distribution of, and conspiracy to distribute and possess with intent to distribute Schedule I/II

controlled substances, in violation of Title 21, United States Code, Sections 841 and 846.

## PROBABLE CAUSE

6.      Starting before July 2022, agents have been investigating a drug trafficking

organization ("DTO") operating in and around the Fredericksburg, Virginia area, including the

City of Fredericksburg, Spotsylvania County, Stafford County and King George County. Agents

identified Omar DIXON as one of the leaders of the DTO in this area. Through this

investigation, agents have determined that the DTO is responsible for distributing cocaine

hydrochloride, cocaine base, fentanyl, heroin, synthetic cathinones and other illegal controlled

substances. During the course of this investigation, agents utilized Court authorized wire and

electronic intercepts from March 29, 2023, through April 27, 2023, and May 2, 2023, through

May 30, 2023 (collectively, "the Wire") on DIXON's telephone, capturing drug trafficking

related calls and text messages between DIXON and other members and associates of the

DIXON DTO. Based on information obtained from the Wire, agents have surveilled members of

the DTO meeting with DIXON and have been able to track DIXON's movements and have

observed DIXON as he has engaged in drug trafficking activities. Based on information

obtained from the Wire, agents arrested individuals who met with DIXON to purchase drugs and

recovered controlled substances from those individuals.

7.      During this investigation, agents conducted numerous controlled purchases of

illegal controlled substances from DIXON with the assistance of a confidential human source of

information (CS-1) and have observed DIXON engaging in what appears to have been hand-to-hand drug transactions with numerous individuals, including two of which were arrested and found to be in possession of controlled substances following hand-to-hand transactions with DIXON. Also, during this investigation, agents received information from a second confidential human source of information (CS-2), who has known DIXON for over 20 years. CS-2 is familiar with DIXON's drug trafficking activities and sold illegal drugs with DIXON in the past. CS-2 described where DIXON had been living, which is the same address DIXON currently uses for his cellphone. CS-2 also provided information about DIXON's other past employment which your affiant was also able to corroborate. CS-2 provided that DIXON was back to selling drugs in the Mayfield subdivision in Fredericksburg, which is a known high-drug crime area. CS-2 also provided that DIXON is selling drugs in King George County. Through the course of this investigation, agents have been able to corroborate this information through surveillance and the Wire.

8.      With the assistance of the Wire, agents identified DIXON's pattern of drug trafficking activities. DIXON supplies controlled substances to members of the DTO in Virginia on consignment and travels back home to his residence in Maryland. DIXON waits for the DTO members to sell the drugs that DIXON fronted them. When the DTO members have money for DIXON, DIXON travels from his home in Maryland and travels around the greater Fredericksburg area and collects the money from the DTO members.

9.      While in the greater Fredericksburg area, DIXON frequents 1604 Airport Avenue, Fredericksburg, Virginia 22401 ("the Airport Avenue Stash House"), a single-family home located in the Mayfield subdivision. DIXON typically goes to the Airport Avenue Stash House before and after drug sales, and sometimes after collecting money from DTO members. DIXON

has also met DTO members at the Airport Avenue Stash House.  Once DIXON collects the money for drugs sold by the DTO members, DIXON meets with a source of supply.  Through the Wire, agents identified DIXON's primary source and were able to observe DIXON meeting with that primary source.  Based on conversations intercepted on the Wire, agents believe DIXON has an additional source of supply.  DIXON repeats this pattern at least weekly, and sometimes more than once a week.  With the information provided by the Wire, agents identified when and where DIXON met with members of the DTO and conducted surveillance of those meetings.  Agents also determined that DIXON had a pattern for meeting different members of the DTO for purposes of resupplying them.  For some, DIXON would meet them at a specific business each time.  Following two such meetings, agents stopped the DTO members and found them to be in possession of distribution quantities of illegal controlled substances.  For others, DIXON would meet at a specific residence.

10.     In July 2022, at the direction of agents, CS-1 reached out to DIXON to arrange the purchase of a half-kilogram of cocaine hydrochloride.  CS-1 had an associate contact Shakeya "K" Hughey, an associate of DIXON, to arrange the meeting between CS-1 and DIXON.  According to CS-1, "K" lives in the Mayfield subdivision, which is located in Fredericksburg, Virginia.  According to CS-2, "K" lives at the Airport Avenue Stash House, a house that DIXON frequents when on his drug distribution routine.  A half kilogram cocaine deal was set up to occur in the Mayfield subdivision.  Prior to the controlled buy, agents searched CS-1 and CS-1's vehicle for contraband, money, and weapons with negative results. CS-1 was equipped with an electronic monitoring and audio/video recording device. CS-1 met with DIXON in the Mayfield subdivision where DIXON distributed approximately 500 grams of suspected cocaine hydrochloride to CS-1 in exchange for $15,000 in official authorized funds

("OAF"). Following the controlled purchase, CS-1 met with agents at a predetermined location where CS-1 turned over the suspected cocaine to agents. Agents again searched CS-1 and CS-1's vehicle for contraband, money, and weapons with negative results. Agents submitted the suspected cocaine to the DEA Mid-Atlantic Laboratory for analysis, where it was determined to be 504.4 grams of a mixture and substance containing cocaine hydrochloride.

11.     On or about August 23, 2022, at agent's direction CS-1 contacted DIXON and arranged a controlled purchase of one-half kilogram of cocaine from DIXON.   CS-1 and DIXON agreed to meet at the WaWa gas station just outside of the Mayfield subdivision. Agents searched CS-1 and CS-1's vehicle before the controlled purchase for contraband, money, and weapons with negative results. Agents equipped CS-1 with an electronic monitoring and audio/video recording device. CS-1 proceeded to the meet location to await DIXON's arrival. While surveilling the WaWa, agents observed DIXON arrive at the WaWa driving a blue Audi SUV, with Maryland plates, registered to Tina McCoy-Roberts. DIXON exited his vehicle and entered the front passenger seat of CS-1's vehicle. Surveillance observed another individual, later identified as Dion MITCHELL, exit DIXON's vehicle.  While in CS-1's vehicle, DIXON gave CS-1 one half kilogram of cocaine hydrochloride in exchange for $15,000 of OAF. Following the controlled purchase, CS-1 met with agents at a predetermined location where CS-1 turned over the suspected cocaine to agents. Agents again searched CS-1 and CS-1's vehicle for contraband, money, and weapons with negative results. Agents submitted the suspected cocaine to the DEA Mid-Atlantic Laboratory for analysis, where it was determined to be 519.5 grams of a mixture and substance containing cocaine hydrochloride.

12.     On or about August 23, 2022, both before and after the controlled buy with CS-1, agents observed DIXON's blue Audi SUV parked in front of the Airport Avenue Stash House in

the Mayfield subdivision. Both CS-1 and CS-2 had previously told agents that DIXON was storing contraband, money and assets at "K's" home. CS-2 advised that "K's" real name was Shakeya and that she resided at 1604 Airport Avenue, in the Mayfield subdivision (the Airport Avenue Stash House).

13.     Throughout this investigation, according to phone toll records and the Wire, DIXON has communicated with the telephone number subscribed to Jakhey HUGHEY, on a regular basis. DIXON typically called HUGHEY on the TARGET CELLULAR DEVICE when he traveled to the area to collect drug proceeds and to distribute additional illegal drugs.

14.     In September 2022, at the request of agents, CS-1 arranged the purchase of fentanyl from DIXON. DIXON was supposed to only bring a sample, but instead brought 110 grams of suspected fentanyl. The substances were in two bags, one that was approximately 10 grams and the second which was approximately 100 grams. At the time of the buy, DIXON told CS-1 that he would have to pay for the extra drugs supplied. A lab analysis of those two drug exhibits revealed that the smaller bag contained a mixture of heroin, fentanyl, p-fluorofentanyl and other substances. Following this buy, agents utilized CS-1 to make a controlled payment of money still due for the drugs DIXON supplied. Immediately following the controlled payment, agents located the silver Lexus DIXON had been driving parked in the area of the Airport Avenue Stash House. Approximately an hour and a half later, agents observed DIXON leaving the Mayfield subdivision.

15.     Upon leaving the Mayfield subdivision, DIXON traveled to a WaWa located on Falcon Drive in Spotsylvania County. Once there, agents observed a man, who was later positively identified (hereinafter, "unindicted coconspirator-1" or "UC-1") walk from the front of the WaWa toward DIXON's vehicle. UC-1 entered the front passenger side of DIXON's vehicle,

where he remained for approximately five minutes before exiting and walking back toward the front of the WaWa. Based on my training and experience as well as previous drug transactions between CS-1 and DIXON, this brief interaction is consistent with DIXON's drug transactions. After leaving the WaWa, DIXON traveled to Olde Greenwich a townhome subdivision with a shared parking area and only one point of entry. Agents did not follow DIXON into the neighborhood. Agents waited in a location where they could observe the exit from Olde Greenwich. Agents suspect DIXON met with Leonard SMITH, who DIXON called prior to arriving at Olde Greenwich. SMITH has a long history of drug-related convictions and had just been found guilty of violating his probation approximately 2 weeks' prior for testing positive for the use of illegal controlled substances. Approximately ten minutes later, agents observed DIXON leave Olde Greenwich and travel back to Mayfield where he was observed parked on the street in front of the Airport Avenue Stash House.

16.     Prior to agents observing DIXON travel to the area of Airport Avenue, toll records show that DIXON received two voice calls and made four outgoing voice calls to phone number 571-786-9973, a phone number subscribed to Dion MITCHELL. These calls would have occurred while DIXON was traveling from Olde Greenwich to Mayfield. DIXON picked up MITCHELL from the area of the Airport Avenue Stash House and the two traveled to the Walmart for another drug transaction.

17.     Agents observed DIXON leave Mayfield in the silver Lexus, travel toward Route 3, and take Route 3 eastbound. Agents observed DIXON enter the Walmart parking lot at 125 Washington Square Plaza, Fredericksburg, Virginia, 22405. DIXON parked in the middle of the parking lot and remained in his vehicle. Shortly thereafter, agents observed a man enter the rear passenger seat of DIXON's vehicle. After approximately two minutes, the man got out of DIXON's vehicle and entered the front passenger seat of a Toyota Sequoia. Based on my

training and experience as well as previous drug transactions between CS-1 and DIXON, this brief interaction is consistent with DIXON's drug transactions.

18.     Agents followed DIXON as he left the Walmart at approximately 6:58 pm and travelled to Tiffany Frye's home at 209 Clint Lane, Stafford County, a residence regularly utilized by DIXON.

19.     Surveillance units established a perimeter around 209 Clint Lane and observed DIXON and Dion MITCHELL exit the silver Lexus and waited outside the residence for a few minutes before entering the residence.  For approximately the next 40 minutes, agents observed DIXON and MITCHELL walking in and out of the residence a number of times, walking between the silver Lexus and Tiffany Frye's blue Cadillac sedan which were parked in front of the residence with the trunks open, and standing in front of the residence.   It appeared that DIXON and MITCHELL were moving items from one car to another and possibly between the residence and the vehicles.  At approximately 7:40 pm, agents observed DIXON and MITCHELL get into Tiffany Frye's dark blue Cadillac sedan, with DIXON in the driver's seat. Agents followed the Cadillac back to the area of the Airport Avenue Stash House in Mayfield.

20.     Agents were not able to observe anyone enter or exit the vehicle due to the fear of being detected. After approximately five minutes the vehicle left from the area of the Airport Avenue Stash House and went across the street to the People's Mart. Agents observed DIXON and MITCHELL exit the vehicle and go inside the store. A few minutes later, both DIXON and MITCHELL got back into the Cadillac and traveled north on Route 2 toward Route 3. Agents followed the vehicle onto Route 3 east to the Sheetz gas station located at 10 Washington Square Plaza, Fredericksburg, Virginia 22405. The vehicle stopped at a gas pump.  Agents watched both DIXON and MITCHELL make multiple trips in and out of the store several times.  Finally, after

about 20 minutes, both men came back to the vehicle and traveled to the same Walmart DIXON was observed at earlier that day.

21.     At approximately 8:30 p.m., agents observed DIXON and MITCHELL leaving the Walmart with MITCHELL driving Frye's Cadillac. Agents followed the vehicle on Route 3 toward King George County and observed the vehicle turn left onto Route 206 toward Colonial Beach. At approximately 8:56 pm, agents observed the vehicle turn into the Pineview Trailer Park, where agents were unable to follow. Agents know that another unindicted coconspirator ("UC-2") often stays with his girlfriend who lives in Pineview Trailer Park.  Approximately 15 minutes later, agents observed the vehicle leave the trailer park and travel west on Route 3 back toward Fredericksburg. Based on my training and experience, as well as DIXON and MITCHELL's activities during the course of this day, it is probable that DIXON and MITCHELL were meeting with UC-2 to either pick up money for drugs previously fronted or delivering drugs to be sold.  DIXON and MITCHELL were only at the trailer park for a short period of time and typically, MITCHELL accompanies DIXON when DIXON is distributing drugs.  At approximately 9:18 pm, agents observed the vehicle turn onto Inaugural Drive in King George County.  Law enforcement databases and DMV list addresses for both DIXON and MITCHELL on Inaugural Drive.

22.     In October 2022, CS-1 met with DIXON to complain about a previous drug transaction. During this meeting, CS-1 provided DIXON an undisclosed amount of money as a deposit for another drug transaction. Following the meeting with CS-1, agents observed DIXON travel to the area of the Airport Avenue Stash House.

23.     On March 29, 2023, agents intercepted a call on the Wire where DIXON called 540-360-3040, which is utilized by HUGHEY. During that call, DIXON told HUGHEY "that boy" said he put some money in that "bag." HUGHEY told DIXON that she would check.

HUGHEY confirmed that there was $400 in the bag. DIXON said that he had forgot to tell him.
DIXON told HUGHEY that he was coming down that day and would come pick it up.
Following that call, DIXON sent a text message to Kelsey Dean MONROE JR, an indicted
coconspirator, saying "she said it's 4 in there." Following that text, MONROE called DIXON,
to keep that and take it off "the junk." DIXON responded, "Alright." MONROE stated, "Cause, I
had something lined up for a guy that didn't need it, so you can just take it off the junk." DIXON
responded, "Alright." Based off my training and experience, I believe MONROE gave
HUGHEY money for DIXON to pick up the next time he was in Virginia. It is common for
larger scale drug traffickers to "front" a quantity of drugs to their associates who are selling the
drugs that are fronted. Through the course of the Wire, intercepted conversations between
DIXON and his associates are consistent with DIXON fronting drugs for resale to his associates.
Additionally, during controlled purchases between CS-1 and DIXON, DIXON has "fronted" CS-
1 narcotics expecting repayment at a later date. On April 26, 2023, MONROE was stopped by
law enforcement after agents intercepted a series of calls between DIXON and MONROE
arranging a suspected drug transaction and a time to meet at a Sheetz located in King George,
Virginia. Virginia State Police (VSP) Counterterrorism and Criminal Interdiction Team (CCI)
stopped MONROE following this interaction with DIXON and was found in possession of
approximately one kilogram of suspected synthetic cathinone.

      24.    In April 2023, CS-1 was instructed by agents to arrange a controlled purchase of
cocaine hydrochloride from DIXON. Surveillance observed DIXON travel from his residence in
Maryland to Airport Avenue. Surveillance observed DIXON depart from Airport Avenue and
travel to an orthodontist office. Following DIXON's orthodontist appointment, according to calls
intercepted on the Wire, DIXON arranged to meet with Walter BROWN, an indicted
coconspirator at "the spot." Surveillance observed DIXON travel to a CVS Pharmacy located at

591 Emancipation Highway in Fredericksburg, VA. On April 20, 2023, BROWN was stopped by law enforcement after agents intercepted a call of DIXON and BROWN arranging to meet at the CVS for a suspected drug transaction. VSP CCI Team stopped BROWN following this interaction with DIXON and found BROWN in possession of approximately 175 grams of crack cocaine.

25.     After meeting with BROWN, agents observed DIXON travel to a Sheetz located at 10 Washington Square Plaza, Fredericksburg, Virginia 22405, after intercepting a call where DIXON and "Buck" arranged to meet at a Sheetz in Stafford County. Surveillance observed DIXON meet with a male who arrived in a red Ford Mustang bearing VA license plate TXM-9883. A subsequent records check showed that vehicle registered to Lawrence "Buck" BUCKNER. The male observed exiting the Mustang and meeting with DIXON matched the description of BUCKNER. Based on my training and experience as well as previous controlled purchases between CS-1 and DIXON, I believe that these interactions are consistent with DIXON's drug related transactions.

26.     After meeting with BROWN and BUCKNER, DIXON was observed traveling to meet with CS-1 to sell cocaine hydrochloride to CS-1 during a prearranged authorized drug transaction in which CS-1 provided $8,000 to DIXON for 9 ounces of cocaine hydrochloride. Following that sale, agents observed DIXON return to the area of the Airport Avenue Stash House. After approximately 5 minutes, DIXON left Airport Avenue and traveled to 1 Bentley Court, Fredericksburg, Virginia 22408, located in Spotsylvania County. DIXON was observed leaving 1 Bentley Court with Leonard SMITH, an indicted coconspirator. Agents observed DIXON travel to the area of 108 Wellington Lakes Drive located in Fredericksburg, Virginia, 22401. Based on intercepted communications, agents believe that DIXON, Leonard SMITH and an unindicted coconspirator ("UC-3") have a shared PCP source of supply that resides at 108-36

Wellington Lakes Drive. Shortly after SMITH and DIXON left 108 Wellington Lakes Drive, agents intercepted a call from UC-3 asking DIXON if SMITH and DIXON had handled "their business." DIXON affirmed that he did and then told the UC-3 that he, referring to DIXON, had to make some money while he was down here, referring to the Fredericksburg area. Agents then observed SMITH and DIXON travel to 1 Bentley Court, where they stayed for approximately 18 minutes, then both SMITH and DIXON traveled to Airport Avenue in the Mayfield subdivision. After staying at the Airport Avenue Stash House for approximately 10 minutes, SMITH and DIXON left the Airport Avenue Stash House and made a number of stops in and around the Fredericksburg area. Among the stops they made, was 356 Riverside Manor Boulevard, Fredericksburg, Virginia, 22401, which is the residence of DIXON's grown stepson, who is also a member of the DTO. After staying there for approximately 10 minutes, DIXON and SMITH travelled to 11604 Silverleaf Lane, Spotsylvania, Virginia, 22407, the residence of another DTO member. The DTO member arrived at the residence and met with DIXON for approximately 7 minutes. DIXON and SMITH left and travelled to the area of 10263 Faith Drive, King George, Virginia, 22485, the residence of at least two DTO members.

27.     On Saturday, April 15, 2023, agents intercepted a call between DIXON and Alphonso JONES, during which DIXON told JONES that he was coming through (referring to the Fredericksburg, Virginia area) no later than 5:30 that day. A call previously intercepted on April 7, 2023, DIXON told JONES that he had a "9 piece" for him. Based on my training and experience, I believe DIXON was telling JONES that he had 9 ounces of controlled substances, believed to be cocaine, for JONES. Nine ounces is a typical weight used by larger scale drug traffickers. It is a quarter of a kilogram.

28.     On April 15, JONES asked DIXON to "refresh" his memory to make sure JONES's numbers were right. DIXON told JONES he would check when he got there. After

this call, JONES sent a text message to DIXON saying that according to JONES's books, it was $3800. At approximately 5:36 p.m., agents observed DIXON travelling from King George County to Fredericksburg and followed DIXON's vehicle to JONES's residence at 403 Princess Elizabeth Street. DIXON texted JONES and said that he was "here." Then agents observed DIXON exit the passenger seat of his vehicle and enter JONES's residence using a side door. Less than 5 minutes later, DIXON exited JONES's residence through the front door. As DIXON was walking to his vehicle, he received a call from another DTO member that told DIXON that an "all-black junk" had just rolled past him. Moments before this call, an agent drove an all-black vehicle past DIXON's vehicle which was stopped outside of JONES's residence. DIXON then called HUGHEY on the TARGET CELLULAR DEVICE and told her that they were coming to her place, which is the Airport Avenue Stash House. Agents followed DIXON from the area of JONES's residence to a car wash near Airport Avenue. DIXON sat in the area of the vacuums before proceeding to the Airport Avenue Stash House.

29.     Approximately 15 minutes after DIXON left JONES's residence, JONES called DIXON and told DIXON that he was going to "pull up over there." A short time later, agents saw JONES's vehicle arrive at the area of the Airport Avenue Stash House in the Mayfield subdivision. A few minutes later JONES left that area and drove across the street to a convenience store where JONES had a brief encounter with an unknown individual in a manner consistent with a hand-to-hand drug transaction. JONES then left the convenience store and returned to the area of the Airport Avenue Stash House. DIXON called JONES and asked where he was, and JONES replied that he was sitting on Frazier, which is a street adjacent to the Airport Avenue Stash House. DIXON told JONES that he was coming. Agents observed DIXON walk from the area of the Airport Avenue Stash House to JONES's vehicle. A few moments later, JONES's vehicle left the area.

30.     On or about April 20, 2023, agents instructed CS-1 to arrange a controlled purchase of cocaine hydrochloride with DIXON. Following the controlled purchase between CS-1 and DIXON, surveillance followed DIXON to People's Mart located across the street from the Mayfield subdivision. After approximately twenty minutes, surveillance observed DIXON travel across the street to the area of the Airport Avenue Stash House. After less than five minutes, DIXON was observed departing the Mayfield subdivision.

31.     On May 7, 2023, DIXON traveled from Maryland to Virginia. The day prior, agents suspect that DIXON met with his source of supply ("UNINDICTED SOS") for a resupply of suspected cocaine. According to a call intercepted on the Wire, the UNINDICTED SOS met with DIXON at his residence in Maryland. After DIXON individually met with three members of the DTO, including Ricardo MORTON, an indicted coconspirator, for suspected drug transactions, surveillance followed DIXON to the Airport Avenue Stash House. Aided by aerial surveillance, DIXON was observed meeting with several unidentified individuals in a manner also consistent with drug related transactions. Aerial surveillance observed DIXON remove an object from his trunk and place it onto the ground. An unknown male was observed picking the object up off the ground and placing it on the trunk of another vehicle. Another individual walked away with the object.  According to a call intercepted on the Wire, DIXON received a call from Alphonso JONES. During that call, JONES told DIXON that he was coming over. DIXON told JONES that he was "out in the field" and that he would stand outside. Surveillance observed JONES depart from his residence at 403 Princess Elizabeth Street, Fredericksburg, Virginia, and travel to the Mayfield subdivision. Aerial surveillance observed JONES's silver Dodge Caravan arrive in front of the Airport Avenue Stash House where DIXON was observed meeting JONES at the front passenger window of his vehicle. Shortly thereafter, JONES

departed the Mayfield subdivision and was observed traveling back to 403 Princess Elizabeth Street.

32.     After meeting with JONES, surveillance observed DIXON leave the area of the Airport Avenue Stash House and meet with a female in his vehicle for approximately one hour. DIXON then traveled back to the Mayfield subdivision, where DIXON met with several individuals approximately 2 blocks away from the Airport Avenue Stash House.  Less than 5 minutes later, DIXON's vehicle was observed parked in front of the Airport Avenue Stash House. Agents intercepted a call from DIXON to an unindicted coconspirator ("UC-4"), during which UC-4 told DIXON he was ten minutes away. DIXON told UC-4 that he "will be over there." Approximately twenty minutes later, agents intercepted another call from UC-4.  During this call, DIXON told UC-4 to give him two minutes and that he was "right here in the hood." Surveillance observed DIXON travel to the area of 1004 Myrick Street, Fredericksburg, Virginia, 22401, which is less than 1-mile from the Airport Avenue Stash House. DIXON was observed walking from his vehicle wearing his single strapped Gucci satchel and enter 1004 Myrick Street. After approximately ten minutes, DIXON was observed leaving from the area of 1004 Myrick Street and traveled back to the Airport Avenue Stash House.

33.     After approximately ten minutes, surveillance observed DIXON depart from the Airport Avenue Stash House and travel across the street to the People's Mart. While at the People's Mart, agents observed DIXON sitting in his vehicle with the door partially open. Surveillance observed DIXON counting a large sum of money that DIXON had pulled from the Gucci satchel he was observed carrying into 1004 Myrick Street. Shortly after, according to a call intercepted on the Wire, DIXON communicated with an unknown male (U/M) about meeting at the People's Mart. DIXON's told the (U/M) that he needed to see him, the U/M told DIXON that he needed to see him too. Shortly after, surveillance observed a man walk from

across the street toward where DIXON's vehicle was parked. That same man was observed walking into the People's Mart as DIXON's vehicle began to exit the parking lot. As DIXON was leaving, agents intercepted a call on the Wire and the U/M told DIXON to "back-up" and that he was behind DIXON. Surveillance observed DIXON back up and the U/M enter the front passenger seat of DIXON's vehicle. Based on my training and experience as well as previous controlled purchases with CS-1 and DIXON as well as other members of the DTO, I believe this interaction was consistent with a drug related transaction.

34.     On May 13, 2023, agents intercepted a call on the Wire, in which DIXON and MORTON arranged to meet. DIXON told MORTON that he "had a little something" for MORTON. According to a call intercepted on the Wire, DIXON called HUGHEY and told her that he was "about to be over there." Shortly after the call with HUGHEY, surveillance observed DIXON's silver Lexus parked in front of the Airport Avenue Stash House.  After approximately thirty minutes, DIXON was observed departing the Mayfield subdivision and traveling to 1200 Forest Village, Fredericksburg, Virginia 22401, MORTON's residence. Prior to DIXON arriving at 1200 Forest Village, surveillance observed MORTON and Lanier Anthony JACKSON, another indicted coconspirator, arrive and MORTON enter building 1200. Upon DIXON's arrival at 1200 Forest Village, DIXON also entered building 1200. After approximately twenty minutes, DIXON was observed exiting building 1200 and departing from the complex.

35.     On May 25, 2023, according to a call intercepted on the Wire, DIXON told MORTON that he was going to like what he got for him. DIXON told MORTON he had to get it somewhere else because "his man" was getting too sloppy. Before travelling to Fredericksburg on May 23 and May 25, DIXON's GPS location showed him travel from his residence in Waldorf, Maryland to the area of College Park, Maryland.  According to DIXON's GPS location, after leaving the area of College Park, Maryland, DIXON travelled to Virginia.

According to a call intercepted on the Wire, DIXON and MORTON agreed to meet somewhere off Route 218 in King George County, Virginia. MORTON told DIXON he would send him the address once he got there. Agents were not able to locate where DIXON and MORTON met. Based on these conversations, this meeting was consistent with a drug transaction.

36.     According to a call intercepted on the Wire, before meeting with MORTON, DIXON told an unindicted coconspirator ("UC-5") that he would be at his house in 10 minutes. Agents knew based off previous intercepted calls with UC-5 and observing DIXON meet with UC-5 on two previous occasions, that UC-5 lived at 10474 Walkers Lane in King George, Virginia 22485. Soon after DIXON met with MORTON, surveillance observed DIXON's blue Audi SUV pull into UC-5's driveway. Surveillance observed UC-5 enter the front passenger seat of DIXON's vehicle. After approximately five minutes, UC-5 exited DIXON's vehicle and walked toward his house. Based off the information intercepted on the Wire as well DIXON's prior interactions with UC-5, I believe this interaction is consistent with a drug transaction.

37.     After meeting with UC-5, DIXON was observed leaving the neighborhood and traveling to 10263 Faith Drive, King George, Virginia 22485. Surveillance conducted a spot check of 10263 Faith Drive, King George, Virginia, and observed DIXON's blue SUV, parked at the main entrance of building 10263. Furthermore, surveillance observed DIXON sitting on the back porch of apartment #2, which is where UC-3 lives. Based on DIXON's drug trafficking activities on this date, his previous suspected drug transactions with UC-3, him being known to frequent this location for suspected drug related purposes and information intercepted on the Wire, I believe DIXON met with UC-3 for a possible drug related transaction.

38.     After approximately one hour, DIXON's blue SUV was observed exiting UC-3's neighborhood and traveling west toward Fredericksburg. According to a call intercepted on the Wire, DIXON and UC-4 arranged to meet at UC-4's residence. Upon DIXON arriving in the

Mayfield subdivision, surveillance observed DIXON's blue SUV park in front of 1004 Myrick Street, Fredericksburg, Virginia 22401. DIXON was observed exiting his vehicle wearing his single strapped Gucci satchel. Simultaneously, UC-4 arrived driving a white Jeep Wrangler bearing VA license plate, UDK-5461. Both UC-4 and DIXON were observed entered the front entrance of 1004 Myrick Street. Based off DIXON's drug trafficking activities on this date, previous suspected drug transactions with UC-4, him being observed wearing his single strapped Gucci satchel which DIXON has been observed carrying suspected narcotics and large sums of money in, I believe this interaction is consistent with a drug related transaction.

39.     Approximately five minutes later, DIXON exited 1004 Myrick Street and traveled east toward Stafford County. Due to heavy traffic, agents were unable to follow DIXON. According to a call intercepted on the Wire, DIXON was waiting for Jakhey or Shakeya HUGHEY to get home. Soon thereafter, surveillance observed DIXON's blue SUV parked in front of the Airport Avenue Stash House. Less than ten minutes later, DIXON's GPS location showed him travelling back toward King George County. DIXON remained in King George for approximately one hour before travelling back to his residence in Maryland.

40.     Agents continued to monitor the calls to and from DIXON's cellphone utilizing a Court authorized pen register until his arrest of June 22, 2023. DIXON continued to communicate with HUGHEY on the TARGET CELLULAR DEVICE on a regular basis, through and including June 18, 2023, 5 days prior to his arrest. Court authorized GPS Location Data from DIXON's cellphone, which provides a general vicinity of the cellphone, showed DIXON in the area of Airport Avenue as recently as June 18, 2023, the same day of the latest call between DIXON and HUGHEY on the TARGET CELLULAR DEVICE.

41.     On June 22, 2023, agents executed a search warrant at the Airport Avenue Stash House. During the execution of the search warrant, agents located 3 loaded firearms, indicia of

drug distribution including scales, packaging material with residue and the TARGET CELLULAR DEVICE found to belong to Shakeya HUGHEY. HUGHEY confirmed the TARGET CELLULAR DEVICE belonged to her and provided agents with the password.

42.     Based on my training and experience, as corroborated by the evidence developed in this case, I know that drug traffickers utilize cellular phones and other cellular devices to conduct their drug trafficking business.  Drug traffickers often communicate via messaging apps, such as iMessage, WhatsApp and Telegram, and social media accounts, such as Facebook, Instagram, Snapchat, TikTok, Twitter and YouTube, none of which are captured by traditional wire intercepts or call detail records.  Drug traffickers typically keep their communications regarding their drug trafficking activities as a means of keeping track of what they owe for drugs received on consignment, commonly called "fronted" and what they are owed for drugs they fronted to others to sell and to enable them to maintain contact with drug suppliers and customers.  I also know that drug traffickers often use payments apps, such as CashApp to pay for illegal controlled substances and maintain evidence of those transactions on their phones.  I also know that drug traffickers often take pictures of themselves, their product, their drug proceeds and coconspirators, using their cellular devices.  I also know that in order to have an iPhone, a user is required to have an AppleID, which enables the user to transfer the contents of their phones to any replacement iPhone.

## TECHNICAL TERMS

43.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through

radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

       b.     Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

       c.     Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable

storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

      d.      GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      e.      Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

f.      IP Address: An Internet Protocol address (or simply "IP address") is a

unique numeric address used by computers on the Internet. An IP address is a series of

four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every

computer attached to the Internet computer must be assigned an IP address so that

Internet traffic sent from and directed to that computer may be directed properly from its

source to its destination. Most Internet service providers control a range of IP addresses.

Some computers have static—that is, long-term—IP addresses, while other computers

have dynamic—that is, frequently changed—IP addresses.

g.      Internet: The Internet is a global network of computers and other

electronic devices that communicate with each other. Due to the structure of the Internet,

connections between devices on the Internet often cross state and international borders,

even when the devices communicating with each other are in the same state.

44.     Based on my training, experience, and research, I know that the TARGET

CELLULAR DEVICE is a "smart phone" which has the capabilities that include most, if not all,

of those described in paragraph 43, above. In my training and experience, the data stored on

smart phone devices of this type includes, among other things, evidence that reveals the likely

possessor and/or user of the device, the manner in which the device was used, and the evidence

described in Attachment B, incorporated by reference herein.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

45.     Based on my knowledge, training, and experience, I know that electronic devices

can store information for long periods of time. Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device. This information can

sometimes be recovered with forensics tools.

46.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.      I know that when an individual uses an electronic device to purchase or obtain illegal controlled substances or pay for those illegal controlled substances, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

47.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit the examination of the TARGET CELLULAR DEVICE consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

48.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

49.     DIXON was using HUGHEY's residence as a place to store and distribute illegal controlled substances and weapons. Intercepted calls on the Wire showed that DIXON communicated with HUGHEY on the TARGET CELLULAR DEVICE. Based on the facts set forth in this affidavit, there is probable cause to believe that the TARGET CELLULAR DEVICE, more fully described in Attachment A, incorporated by reference herein, contains electronically stored data that constitutes evidence of HUGHEY's participation in DIXON's long term distribution operation and, conspiracy to distribute and possess with intent to distribute Schedule I/II controlled substances, in violation of Title 21, United States Code, Sections 841, and 846.

Further your affiant sayeth not.


Stephen C. Lamar
Task Force Officer
Federal Bureau of Investigation

Sworn and ascribed to before me this 14th day of July, 2023, in Richmond, Virginia.


/s/ MRC
The Honorable Mark R. Colombell
United States Magistrate Judge

## ATTACHMENT A

*Property to be searched*

The item to be searched is an Apple iPhone Pro Max assigned telephone number 540-360-3040, utilized by Shakeya HUGHEY, and seized during the execution of a search warrant on June 22, 2023, from HUGHEY's presence in HUGHEY's residence located at 1604 Airport Avenue, Fredericksburg, Virginia 22401.   The black Apple iPhone is currently located in the Evidence Control Room of the FBI's Richmond Division located at 1970 East Parham Road, Richmond, Virginia, which is in the Eastern District of Virginia.

This warrant authorizes the forensic examination of the Apple iPhone Pro Max for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

Items to be Seized

1.      All records on the Subject Device described in Attachment A that relate to violations of 21 U.S.C. §§ 841 and 846, to wit:  illegal distribution of unlawful controlled substances, and conspiracy to do the same including:

        a.      records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses, lists of customers and related identifying information;

        b.      any information, including social media posts and messages, communication applications, and money transfer applications, regarding the types, amounts, and prices of illegal controlled substances being purchased, sold, or offered for sale as well as dates, places, and amounts of specific transactions;

        c.      any communications, to include SMS/MMS and social media messages, related to the sale or purchase of illegal controlled substances;

        d.      any photographs depicting illegal controlled substances, large quantities of U.S. Currency or coconspirators, including Omar Dixon, Alphonso Jones, Dion Mitchell, Ricardo Morton, Walter Brown, Kelsey Dean Monroe, Jr., Leonard Smith, Lanier Jackson, and unindicted coconspirators known to law enforcement agents;

        e.      any information related to sources of illegal controlled substances and customers of illegal controlled substances trafficking (including names, addresses, phone numbers, subscriber names, usernames, screen name, or any other identifying information), to include contact lists, friend lists, and call history;

f.     any information related to drug-related travel of Shakeya HUGHEY from July 2022 through June 22, 2023;

g.     all bank records, checks, credit card bills, account information, and other financial records that would be evidence of illegal drug trafficking proceeds or unexplained wealth.

2.     Evidence of user attribution showing who used or owned the TARGET CELLULAR DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.